T.C. Memo. 1996-335


UNITED STATES TAX COURT


LAWRENCE R. ROBERSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1595-89.                          Filed July 24, 1996.


<u>Joseph Falcone</u>, for petitioner.

<u>Timothy S. Murphy</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income taxes and additions to tax as follows:

| Year | Deficiency | Additions to Tax | | | |
|------|-----------|------------|----------------|----------------|-----------|
| | | Sec. 6653(a) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
| 1979 | $1,476 | $74 | --- | --- | $443.00 |
| 1980 | 3,402 | 170 | --- | --- | 1,021.00 |
| 1981 | 3,532 | --- | $177.00 | [1] | 1,060.00 |
| 1982 | 7,975 | --- | 398.75 | [1] | 1,766.10 |
| 1983 | 9,428 | --- | 471.40 | [1] | 1,677.60 |
| 1984 | 2,472 | --- | 123.60 | [1] | 741.60 |

[1] 50 percent of the interest due on the portion of the underpayment attributable to negligence.

After concessions, the sole issue for decision is whether petitioner is liable for the applicable additions to tax under section 6653(a) and under section 6653(a)(1) and (2) in the years at issue.

All section references are to the Internal Revenue Code as in effect for the years under consideration. All Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner resided in Detroit, Michigan, at the time the petition was filed in this case.

Petitioner received a bachelor of arts degree from Alabama A & M University in 1967 and a master's of business administration (M.B.A.) with concentrations in finance and management from Indiana University in 1970. After receiving his M.B.A. degree, petitioner was employed by the Ford Motor Co.,

where he held various positions in the corporate finance area, including cost analyst, financial analyst, and eventually, supervisor of profit analysis.  In those positions, petitioner's duties included analyzing the profitability of cars and looking at the fixed costs to produce a new car.  Petitioner left the Ford Motor Co. in 1983 to start a financial planning firm.  Thereafter, petitioner became a certified financial planner and has worked in the financial planning and investment advisory business through the date of trial.

In 1978 or 1979, petitioner became acquainted with Louis Cunningham, a financial planner and securities broker.  Shortly thereafter, petitioner began to invest in various mutual funds, stocks, bonds, and variable annuities based on Cunningham's suggestions and advice.  Petitioner believed that all investments presented to him by Cunningham had been reviewed and placed on an approved list of investments by Cunningham's brokerage firm, Mutual Service Corp. (MSC).  In 1982, Cunningham informed petitioner of an investment opportunity in the music industry, specifically, the purchase of leasehold interests in master recordings from the Southampton Music Co. (Southampton). Cunningham earned a commission if petitioner decided to invest in Southampton, and he encouraged petitioner to do so. Petitioner could not recall whether Cunningham had indicated to

him that the Southampton investment had been investigated by MSC, and in fact no such investigation had been done.

At the time he learned of the Southampton investment, petitioner was not familiar with the music industry or master recordings. Petitioner claims that he familiarized himself with the music industry by spending numerous hours at the library doing research, talking to some musicians from his church, attending several seminars about investing in the music industry, and on one or two occasions, speaking on the phone with someone from Motown Records. There is no indication, however, that these efforts included an investigation of the Southampton master recording investment presented to petitioner by Cunningham.[1] When asked at trial what he had learned from his research, petitioner stated: "I learned that it was an industry where you could make a lot of money if you got a good album--a good person that became popular." Petitioner provided no evidence, however, that he had researched the profitability

---

[1] Petitioner introduced into evidence two brochures he allegedly received at a seminar on investing in the music industry. One of the brochures is a quarterly report prepared by another master recording leasing company, Audio Leasing Corp., and includes information about the activities of that company as well as news about the music industry generally. The brochure also emphasizes the alleged tax incentives in investing in master recording leases. The second brochure is a glossary of terms used in the music industry. Neither brochure contains a discussion of the nontax economic benefits to be expected from a master recording lease, nor do they discuss the Southampton investment program at issue in this case.

of a master recording or the likelihood of success of a recording artist.

In November 1982, Cunningham provided petitioner with a promotional booklet entitled "Southampton Music Company: 1982-1983 Program". The promotional booklet emphasizes the tax benefits of investing in a master recording rather than any economic benefits that could be expected. The booklet includes a 36-page tax opinion by Joseph Wetzel, an attorney in Portland, Oregon. The tax opinion discusses the tax benefits of the investment and potential tax problems that could be raised by the Internal Revenue Service and ways to avoid them. The promotional booklet also contains a chart entitled "Table of Advance Lease Payments and First Year Tax Benefits" with four levels of escalating investments with escalating tax benefits. For example, according to the chart, a cash investment of $31,000 in a master recording valued at $400,000 would yield in the first year an investment tax credit of $40,000 and a tax deduction of $26,000.

Petitioner asked William Parnell, an acquaintance who was a return preparer and an enrolled agent before the Internal Revenue Service, to review the Southampton promotional booklet. According to petitioner,[2] Parnell's assessment of the

---

[2] Parnell did not testify in this case.

Southampton investment was that "If they would do everything that they said in the booklet, it looked okay to him."

Based on his discussions with Cunningham and Parnell, and on his own research of the music industry, petitioner decided to invest in Southampton and signed a master recording lease agreement on December 22, 1982. Petitioner was aware of the tax benefits expected from the investment. The availability of those benefits for the 1982 taxable year had an impact on petitioner's decision to sign the lease agreement prior to the end of the year. Pursuant to the agreement, petitioner was to pay Southampton a total of $10,500[3] for a one-fourth leasehold interest in a master recording featuring Ray Pillow, a country-western singer. The lease was for a term of 5 years and 10 months. Petitioner had not listened to or received a copy of the Ray Pillow master recording prior to investing in Southampton.

Petitioner's master recording was to be distributed as a phonograph album by Indigo Music Co. (Indigo), a distributor recommended to petitioner by Southampton. Petitioner did not meet or negotiate with anyone from Indigo prior to investing in Southampton. Pursuant to his agreements with Indigo and

---

[3] Petitioner paid $8,400 on or about the date the lease was signed and reported that amount as rental expense on his 1982 tax return. The remaining $2,100 was paid approximately 1 year thereafter and reported as rental expense on petitioner's 1983 return.

Southampton, petitioner was to receive royalty payments from Indigo on album sales, and in turn, petitioner was to make additional rental payments to Southampton based on a percentage of net profits earned. There is no evidence in the record that petitioner has ever received royalty payments from Indigo or that any additional rental payments have been made to Southampton.[4]

Pursuant to the lease agreement, Southampton agreed to pass to petitioner his one-fourth share of any investment tax credit generated by the Ray Pillow master recording. On his 1982 tax return, petitioner reported a tentative regular investment credit from his Southampton investment of $21,250. This amount was determined based on a value for the Ray Pillow master recording reported to petitioner by Southampton of $850,000.[5] Petitioner never obtained an independent appraisal of the Ray Pillow master recording but relied solely on the value reported to him by Southampton.[6] Of the total investment tax credit of

---

[4] On his 1984 tax return, however, petitioner reported $15 in "Other Income" from his Southampton investment.

[5] Petitioner's tentative regular investment tax credit was determined by multiplying the regular investment tax credit percentage (10 percent) by petitioner's one-fourth share of the total value of the master recording reported by Southampton (10 percent x ($850,000 x ¼) = $21,250).

[6] Petitioner introduced into evidence two documents that he received from Southampton purporting to be appraisals of the Ray Pillow master recording. Petitioner's reliance on these

(continued...)

$21,250, petitioner used $2,776.45 of the credit in 1982, carried back unused credit in the amounts of $1,476, $3,402, and $3,532 to 1979, 1980, and 1981, respectively, and carried forward additional unused credit in the amounts of $3,693 and $3,191.28 to 1983 and 1984, respectively. Petitioner had $3,179.27 of unused investment tax credit to carry over into later years. Additionally, on his 1983 tax return petitioner deducted $2,750 in distribution costs relating to the Southampton investment.

Petitioner's 1982 tax return was prepared by an accounting firm, Chaness and Simon, and signed by a representative of that firm on April 10, 1983. Petitioner provided the accounting firm with the Southampton promotional booklet and an investment tax credit election statement that he had received from Southampton for use in preparing his 1982 return. Petitioner presumably provided the same documents to Ramona Henderson, a C.P.A. who petitioner claims prepared his 1983 tax return after petitioner provided "receipts and information on all investments to her and

---

[6](...continued)
documents as independent appraisals or as indications of his expected economic benefit from the investment is misplaced as the appraisals were commissioned by and addressed to Southampton and were furnished to petitioner several months after petitioner made his investment in Southampton and after his 1982 tax return was filed.

discussed them all with her".[7]  There is no evidence in the record that either return preparer relied on anything other than the materials provided to petitioner by Southampton or that they investigated the bona fides of the master recording investment at the time they completed petitioner's 1982 and 1983 tax returns.

Subsequent to investing in Southampton, and after his 1982 tax return was filed, petitioner wrote to Indigo requesting a sample copy of the Ray Pillow album and information about when he could expect to receive royalty payments from album sales. Petitioner also wrote to Southampton seeking clarification of the percentage of profits to be paid to Southampton as additional rent pursuant to the master recording lease.  The letters from petitioner to Indigo and Southampton do not request information about the sales potential of the Ray Pillow master recording.  In addition to a copy of the album, petitioner received correspondence from Southampton explaining the revenue distribution clause of the lease agreement and two letters sent by Indigo to all Southampton investors regarding proposed distribution outlets and marketing techniques.  Additionally, in early 1985, petitioner claims to have learned from Southampton that other investors had been successfully represented before

---

[7]  We note, however, that petitioner's 1983 tax return does not bear a preparer's signature.

the Internal Revenue Service by an attorney, Mark Vogel. Although Vogel did not testify in this case, petitioner claims to have spoken with him and relied on that conversation as additional support for his belief that the Southampton master recordings were bona fide investments.

OPINION

Petitioner has conceded that he is liable for the full amount of the deficiencies determined by respondent relating to his Southampton master recording investment. The only issue for consideration is whether petitioner is liable for the additions to tax for negligence under section 6653(a).

Section 6653(a) for 1979 and 1980 and section 6653(a)(1) for 1981 through 1984 provide for an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) for 1981 through 1984 provides for an addition to tax of 50 percent of the interest on the portion of the underpayment attributable to negligence. Negligence is defined as a lack of due care or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of negligence is presumed to be correct, and petitioner has the burden of proving that it is erroneous. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757,

791-792 (1972).  The addition to tax for negligence under section 6653 may be correctly assessed in cases where claimed deductions are not supported by the facts.  Sandvall v. Commissioner, 898 F.2d 455, 459 (5th Cir. 1990), affg. T.C. Memo. 1989-56 and T.C. Memo. 1989-189; Marcello v. Commissioner, 380 F.2d 499 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964).

Petitioner maintains that he acted reasonably and with due care in claiming deductions and credits with respect to his investment in Southampton.  In support thereof, petitioner argues that:  (1) He relied on promotional materials and appraisals furnished by Southampton; (2) he relied on his investment adviser and an enrolled agent who reviewed the promotional materials; (3) he conducted his own investigation of the music industry; (4) he monitored his investment through correspondence with Indigo and Southampton; (5) he relied on accountants who prepared his 1982 and 1983 tax returns; and (6) he believed other investors had been successfully represented by an attorney regarding the propriety of the tax treatment of their Southampton investments.

Under some circumstances, a taxpayer may avoid liability for the additions to tax under section 6653(a) if reasonable reliance on a competent professional adviser is shown.  Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011

(5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Id. In order for reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the reliance must be reasonable, in good faith, and based upon full disclosure. Id.; see Weis v. Commissioner, 94 T.C. 473, 487 (1990). Taxpayers must be able to show that the adviser reached his or her decisions independently. See Leonhart v. Commissioner, 414 F.2d 749, 750 (4th Cir. 1969), affg. T.C. Memo. 1968-98. We have rejected pleas of reliance when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. Beck v. Commissioner, 85 T.C. 557 (1985); Flowers v. Commissioner, 80 T.C. 914 (1983). Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence. Illes v. Commissioner, 982 F.2d 163, 166 (6th Cir. 1992), affg. per curiam T.C. Memo. 1991-449; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); McCrary v. Commissioner, 92 T.C. 827, 850

(1989); Rybak v. Commissioner, 91 T.C. 524, 565 (1988).

Additionally, when an investment has such obviously suspect tax claims as to put a reasonable taxpayer under a duty of inquiry, a good faith investigation of the underlying viability, financial structure, and economics of the investment is required.  LaVerne v. Commissioner, supra at 652-653; Horn v. Commissioner, 90 T.C. 908, 942 (1988).

In the instant case, petitioner claims that he relied on several professional advisers with respect to his investment in Southampton.  Petitioner learned about the Southampton investment program from Cunningham, a financial adviser who encouraged petitioner to invest in a master recording lease. Petitioner was aware, however, that Cunningham received a commission if petitioner decided to invest in Southampton and that Cunningham was serving as a salesman rather than an independent adviser acting solely on petitioner's behalf. Petitioner also argues that he relied on statements made by Parnell, an enrolled agent who had reviewed the Southampton promotional booklet.  There is no evidence in the record that Parnell relied on anything other than the materials furnished by Southampton or that either Parnell or Cunningham had otherwise investigated the bona fides of the master recording investment. Similarly, there has been no showing that the accountants who prepared petitioner's 1982 and 1983 tax returns evaluated the

merits of the claimed deductions and investment tax credits rather than simply preparing the tax returns based on information supplied to petitioner by Southampton. Finally, petitioner's alleged conversation with Vogel in early 1985 regarding the tax treatment of other Southampton investors provides no support for petitioner's argument that an adequate independent investigation of the Southampton program was performed prior to his investment or that petitioner had an objective to earn an economic profit at the time the transaction was entered into.

In light of the suspect tax benefits offered by the Southampton investment and noting petitioner's education and work experience in the area of financial and profit analysis, we do not find petitioner's reliance on his alleged advisers to be reasonable or in keeping with the standard of an ordinarily prudent person. We note that none of the advisers purportedly relied on by petitioner had any special qualifications or experience in the music industry or with master recording leases that would reasonably lead them to believe that the Southampton investment program would be economically profitable. It is not reasonable or prudent to rely upon an adviser regarding matters outside of his field of expertise or with respect to facts which he does not verify. See Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987).

Petitioner also argues that his own investigation of the music industry constituted sufficient inquiry into the Southampton investment to preclude imposition of section 6653(a) negligence additions. Negligence additions may be imposed if a taxpayer fails to exercise due diligence in an investigation into the bona fides of an obviously suspect transaction. Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; LaVerne v. Commissioner, supra at 652-653. Petitioner's education and experience as a financial analyst should be considered in determining whether he was negligent in failing to conduct a good faith investigation of the Southampton master recording program. Leuhsler v. Commissioner, supra; Freytag v. Commissioner, 89 T.C. at 887-889.

On its face, the Southampton investment should have raised serious questions in the minds of ordinarily prudent investors. The fact that Southampton leased petitioner a one-fourth interest in a master recording purportedly worth $850,000 for a total of $10,500 which immediately generated an investment tax credit of $21,250 as well as deductions equal to the amount of all lease payments made should have prompted petitioner to look beyond the promotional materials and to investigate the economic viability of the venture. See Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989) (taxpayers

negligent where tax savings were almost double the amount of their cash outlay). Petitioner's alleged investigation of the music industry was superficial at best and does not represent a due diligence inquiry into the specifics of the Southampton investment. In addition, petitioner's limited correspondence with Indigo and Southampton does not demonstrate a concern for the economic viability of the master recording investment. There is no evidence that petitioner investigated the bona fides of the Southampton program or that he was concerned with anything other than the tax benefits involved. If petitioner had conducted his own good faith investigation, he would have discerned strong reasons to conclude that the Southampton investment program was not bona fide and was designed primarily for tax-avoidance purposes.

Finally, petitioner's reliance on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, as authority for his position that his actions were reasonable is misplaced. The taxpayers in Heasley were uneducated and had extremely limited investment experience. Moreover, the U.S. Court of Appeals for the Fifth Circuit indicated that the taxpayers in Heasley both intended to earn an economic profit on the investment in issue and actively monitored that investment. We cannot reach similar conclusions in the present case. Petitioner herein was highly educated, had worked in the area of

financial and profit analysis, and had previous investment experience. The evidence in this case is that petitioner anticipated benefits primarily from tax savings. Petitioner has failed to provide evidence of serious efforts to monitor the Southampton investment or reliable evidence of any profit objective independent of tax savings. We consider petitioner's argument with respect to the Heasley case inapplicable.

Under the circumstances of this case, we find that petitioner's actions were not reasonable and prudent and that the underpayments attributable to the Southampton claims were due to negligence. Accordingly, the additions to tax under sections 6653(a) and 6653(a)(1) are sustained in full and the additions to tax under section 6653(a)(2) are sustained as to the underpayments due to the Southampton investment.

To reflect the foregoing and the concessions of the parties,

Decision will be entered
under Rule 155.